

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-13-00149-CV

IN THE INTEREST OF A.D.C. AND
J.D.C., CHILDREN

----------

FROM THE 16TH DISTRICT COURT OF DENTON COUNTY

----------

## MEMORANDUM OPINION[1]

----------

Appellant J.W.S. (Father) appeals the trial court's order terminating his parental rights to two of his children, A.D.C. and J.D.C. In three issues, Father contends that there is legally and factually insufficient evidence to establish that he knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered their physical or emotional well-being, that there is legally and factually insufficient evidence to prove that he engaged in conduct or

---

[1]*See* Tex. R. App. P. 47.4.

knowingly placed the children with persons who engaged in conduct that endangered the children's physical or emotional well-being, that there is legally and factually insufficient evidence to establish that he failed to comply with the provisions of a court order that specifically established actions necessary for him to obtain the children's return after they had been removed for abuse or neglect, and that there is factually insufficient evidence to show that termination is in the children's best interest. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E), (O), (2) (West Supp. 2012). We affirm.

## Background Facts

**The first investigation concerning the children**

A.D.C., the older of the two children at issue, was born in March 2005, and J.D.C. was born in September 2006. They were eight and seven years old, respectively, at the time of trial. Father was in a relationship with T.F.A. (Mother) until 2006, and he raised these two children for a period of time after he and Mother ended their relationship that year because Mother believed that she needed to "get herself together."[2] Father returned the children to Mother approximately two years later, when A.D.C. was three years old and J.D.C. was almost two years old, because he had lost his job and was no longer able to provide for the children.

---

[2]J.D.C. began to live with Father ten days after his birth because Mother "didn't want the responsibility" of caring for him on a full-time basis. A.D.C. was already living with Father at the time of J.D.C.'s birth.

Father saw the children "off and on" from the summer of 2008 until the summer of 2010. During that time, Mother would sometimes deny him access to the children and not allow him to visit or see them. According to Father, this behavior usually arose when Mother entered into a new relationship. Father testified that when Mother was single, she tended to be sober, employed, and accommodating to Father's desire to visit the children; however, Mother became uncooperative when she entered into new relationships. Furthermore, Father stated that he had concerns about the sufficiency of care that Mother provided to the children whenever she was in a relationship because she would abuse alcohol and drugs and neglect the children's needs. Between 2008 and 2010, Father provided Mother with clothing and other items for the children, but he testified that he would not give her money because he was afraid that she would use it for drugs or alcohol.[3]

In June 2010, Child Protective Services (CPS), a division of the Department of Family and Protective Services (the Department), began investigating allegations of neglectful supervision against Mother that both Father and Mother's mother had reported. The reports were that Mother had been leaving the children home alone, using drugs, and prostituting herself; Father was also concerned that the children were unclean and that they "looked small."

---

[3]Father testified that he once gave Mother clothing for the children with a receipt and that she returned the clothing, bought cheaper clothing, and kept the difference.

A CPS investigator visited Mother, learned that the children had been playing unattended at a park, and noticed that Mother's apartment was not clean and contained little food. Mother admitted that she had recently used marijuana, but she denied using other drugs or engaging in prostitution. Mother agreed to not leave the children alone again. When CPS interviewed the children, the investigator learned that they had been left alone overnight previously on multiple occasions.

CPS set up family-based safety services for Mother, which allowed the children to remain with her while she participated in the services. Although Mother did not complete those services, CPS dismissed its initial investigation in 2011 because it concluded that Mother had controlled her risk factors.

During the course of the first CPS investigation, Mother moved often, and Father was unable to locate her or his children. At trial, he claimed that he had attempted to follow up with Mother for a week following the CPS referral in 2010 but that she had never responded. After that, he attempted to call the children's maternal grandmother, but she too was unable to locate Mother or the children. He also tried, without success, to contact Mother through the Internet. Thus, Father testified that it was "impossible" for him to see the children during that time.

**The second investigation concerning the children**

CPS opened the current case against Mother and Father as a result of a violent domestic dispute that occurred on an early morning in November 2011

4

between Mother and her partner (not between Mother and Father) and that resulted in the police being called. That night, Mother and her partner had been drinking and had gotten into an argument. Mother's partner locked her out of their bedroom, and with her bare hands, Mother then attempted to break into the bedroom through a window on a patio. Mother received severe injuries; in addition to many small cuts on her hands, she severed an artery and suffered significant blood loss.

A responding police officer found Mother screaming while lying on a couch. The officer noted the "tremendous amount of blood everywhere" and retrieved a tourniquet from his squad car to stop Mother's blood flow. Mother had injured her partner in the dispute as well by inflicting multiple scratches, bruises, and cuts on her partner's face and by tearing off part of her partner's right ear.[4] The police found the two children in the apartment, hiding in a bedroom. One child had blood on his shirt, indicating that he had likely been present for the dispute, and both children had blood on their shoes, suggesting that they had walked through the blood in the apartment after the altercation. Mother went to a hospital, and an officer notified CPS about the condition of the children.

CPS interviewed the children separately; however, both told similar stories: Mother and her partner had gotten into a fight, Mother had been cut, there was broken glass, and there was blood everywhere. They both stated that fights

[4]At trial, the responding officer opined that Mother was the primary aggressor in the domestic dispute.

5

between Mother and her partner occurred frequently. When CPS asked the child without blood on his shirt why he did not have blood on his shirt, he responded that he had been hiding in the closet because the fighting scared him.[5] At trial, a CPS worker noted that on the day of the incident between Mother and her partner, the children did not seem worried about Mother's condition because it "seemed like this was kind of how their [lives were]." More generally, when the worker interviewed the children, she noted the all-around poor day-to-day care that they had received.

The CPS worker also talked to Mother, and Mother stated that she had engaged in other altercations with her partner in the past. Mother said that she had not been in contact with Father for a significant period of time. She told the CPS worker that Father, who is many years older than she is, had sexually abused her from when she was twelve years old until she was seventeen years old.[6] Mother insisted that Father would not be an appropriate placement for the children. Based on the CPS worker's determination regarding the

---

[5]The children's counselor later testified that the older brother likely "shielded" the younger brother during this altercation and other altercations between Mother and her partner.

[6]Later, when Mother told a counselor about the abuse, she was "crying, anxious, [and] fearful." The counselor testified that she believed Mother's allegation of sexual abuse against Father.

inappropriateness of placement with Father or the other contacts that Mother had provided, CPS removed the children from her care.[7]

CPS initially alleged that there was reason to believe that Mother had neglectfully supervised the children. CPS did not make any initial allegations against Father because the children had not been in contact with him for over a year and because the domestic violence leading to the removal of the children occurred at Mother's house. Soon after Mother's dispute with her partner, CPS contacted Father to tell him that CPS had placed the children into foster care and to inform him about the importance of completing services related to the children. Father said that he could not possess the children at that time because he was "out of a job," and he refused to give CPS the address of his residence. Father admitted to a history of "mutual" physical violence between him and Mother and to domestic violence between him and his subsequent girlfriend. He did not initially ask how the children were doing in foster care or whether there was anything that he could provide for them.

---

[7]Although the CPS worker did not attempt to contact Father before removing the children from Mother's care because the worker's focus was "getting the children safe and secured," the worker testified that CPS likely would not have approved placement of the children with Father at that time based upon the statement of Mother that Father had sexually abused her. The worker believed Mother's statement about Father's sexual abuse at the time Mother made it.

**The children**

When the CPS investigator transported the children to foster care in November 2011, she noted a few key aspects of their demeanor. First, one of the children told her how they had usually slept on the floor, and both were excited to sleep in a bed. Also, both of the children seemed "upbeat," whereas they had appeared scared when she had interviewed them previously.

The children began to live with a foster family, and they were initially well-adjusted and well-behaved. Soon thereafter, however, the children began exhibiting signs of mental and emotional distress, such that the older child entered counseling in September 2012, and the younger child followed soon thereafter in January 2013. The older child went in and out of hospitals, residential treatment centers, and multiple foster homes in 2011 and 2012 because of behavioral issues. He showed suicidal tendencies as well as aggressive outbursts. Among other things, the older child would hit other people, throw chairs and tables at school, and even bite his teachers; he was prone to extreme mood swings. The counselor addressed the older child's difficulties by teaching skills related to impulse control, obedience, and coping. The older child's behavior began to improve dramatically.[8] The counselor attributed this improvement both to the older child's foster mother, who provided a consistent,

_____

[8]The older child had been diagnosed with an impulse control disorder, an adjustment disorder (meaning that his emotions fluctuated), and ADHD. He was on a prescription regimen in addition to counseling.

encouraging, and positive environment, and to the older child's school, which implemented a behavior inhibitions intervention plan to address the older child's unique behavioral issues.

The counselor also testified that the younger child exhibited behavioral issues. Specifically, the younger child had been diagnosed with a calming disorder and an adjustment disorder. The younger child had also been admitted to a hospital in 2012. The younger brother displayed significant attachment to the older brother because the older brother had served as a protector and a nurturer prior to the children entering foster care. When the children entered foster care and the older brother no longer needed to fill that role, the younger brother began to act out to regain individual attention from his brother. For instance, the counselor noted that a foster mother reported that the younger brother had been sexually misbehaving toward his older brother. CPS and the children's counselor both believed that this behavior was intended to garner attention rather than behavior learned as a result of sexual abuse.

The counselor further stated that both children expressed sorrow over missing their mother. The counselor noted, however, that the children rarely said anything about Father, nor did they express sorrow over missing him. The counselor suggested that returning the children to Father could be detrimental, especially because of Father's tumultuous relationship with his girlfriend, which contrasted to the stability of a foster home that had helped alleviate the children's behavioral issues. The counselor emphasized that the children needed a stable

environment and caregivers who were able to meet their behavioral needs with patience. When the counselor asked the children if they would like to live with Father, they said that they were willing to move in with Father but primarily emphasized their desire to remain together regardless of placement.

The children's foster home at the time of trial provided a safe and healthy environment for the children. The foster mother in particular was skilled at meeting the distinct and individual needs of children with the behavioral and emotional issues that the children faced. Even though the foster mother was considering adopting the two children at the time of the trial, she had not decided whether she wished to adopt for certain; however, she did indicate that she would be willing to keep the children in the event that she did not adopt until the time that they found a permanent placement. Furthermore, even though the caseworker could not guarantee that she would find an alternate adoptive placement for the children other than their current foster mother, she was confident that she would be able to timely secure permanent placement for the children in the event of termination.

**Father**

In November 2011, when the dispute between Mother and her partner occurred, Father was living with his cousin in Dallas. He had not been in contact with his children for approximately a year and a half. He testified that he had originally called CPS on Mother for the prior CPS investigation and that he had not seen his children since because Mother had gone "into hiding."

Father had been married to Mother's sister, who is ten years older than Mother, during the time that Mother alleged he had sexually abused her.[9] Mother originally moved in with her sister and Father when she was twelve years old. Father denied any allegations of sexual abuse against Mother and asserted that Mother had initiated their sexual relationship when she was seventeen years old and he was thirty-four years old. Specifically, his testimony was that in 2003, Mother lay naked in his bed and that after Mother initiated sexual contact that same day, he decided to continue the relationship.

The sexual relationship between Mother and Father then continued for about three more years until near the time that their second child was born. CPS never specifically investigated Mother's sexual abuse allegations, nor did it recommend that Father complete sexual deviancy services, as there were no allegations that Father had sexually abused his children.

According to Father's testimony, he and Mother had a history of smoking marijuana, and they smoked marijuana during the course of their relationship through 2006. Father admitted to smoking marijuana since he was eight years old but testified that he had not smoked marijuana since 2006; he also testified that Mother began smoking marijuana when she was thirteen or fourteen years

---

[9]Father married Mother's sister in Germany, and Mother began to live with Father and her sister after Father got out of the military.

old.[10]   Father further stated that Mother smoked marijuana and drank alcohol while pregnant with both children and that although he expressed concern about that behavior, he never reported it to CPS, her doctors, or anyone else.

Aside from the children in this case, Father has many children by several different women, including two daughters by Mother's sister.  Father had been married to some of these women, and he admitted to infidelity in some of these relationships.  In fact, Father's infidelity contributed to the end of his marriage to Mother's sister.  Father's current girlfriend, who is twenty years younger than he is and who he met on a telephone chat line, has one child from a previous relationship, one child by Father, and was pregnant with Father's second child by her at the time of the trial.

In addition to allegations of domestic violence with Mother, Father had been charged with assault against one of his ex-wives.  Specifically regarding Mother, Father testified that she always initiated violence and attacked him first; he claimed that he had acted only in self-defense.  Father testified that the children subject to this appeal sometimes were present during episodes of domestic violence.

Father began dating his current girlfriend in 2010.  He admitted that he had pled guilty to assault against his girlfriend that occurred in January 2011;[11]

---

[10]Throughout the pendency of this case, Father never tested positive on a drug test.

[11]For this offense, Father received twenty-four days' confinement.

however, he also testified that the allegations concerning that charge were false, claiming that he had not, contrary to details contained in a police report, thrown her across the floor, thrown her belongings outside, or approached her with a knife.[12] Father also pled guilty to assaulting his girlfriend in May 2011 even though he similarly denied factual allegations within a police report related to that offense at trial. Relating to the May 2011 assault charge, a trial court deferred adjudication of Father's guilt and placed him on community supervision. Father had also been arrested twice—in September 2011 and December 2012—for not paying child support,[13] and he had been convicted in 2011 for possessing drug paraphernalia.

Father admitted that he was aware of the service plan that CPS had established for him. He testified that he participated in all of the services within the plan except for batterer's intervention. He claimed that he did not have the money to pay for that course;[14] however, he later admitted that he could have paid for the course but chose to use the money to buy other things instead,

---

[12]The police report also states that a two-year-old child was present during this altercation.

[13]At the time of the trial, Father owed $40,000 in child support arrearages for one of his children and $7,000 for another child. Also, Father had not filed tax returns in the six years preceding the termination trial; he testified that he had not filed the returns out of spite because one of the mothers of his children was seeking back child support.

[14]Father testified that the total cost of the course would have been approximately $700.

13

including cigarettes and alcohol. CPS wished for Father's girlfriend to complete services as well if Father wanted the children returned, but the girlfriend did not follow through with services. Although Father and his girlfriend sought "couple's counseling," they received it informally from the girlfriend's father, a pastor, even though CPS had offered to arrange and fund formal couple's counseling from a licensed professional. Furthermore, Father did not follow through with the recommendations of his counselors for further services even though his service plan and the court order regarding his service plan both explicitly stated that he was to cooperate with any recommendation made in the course of his counseling.

Father also routinely missed visitations, court hearings, and other meetings with CPS. During the period when both Mother and Father had visitation rights, albeit separately from one another, Mother attended significantly more visits than Father even while facing financial and transportation difficulties. The evidence at trial established that there was little physical interaction between Father and the children at the visits Father attended; mostly, he would sit in a chair and talk to the children. Also, a CPS caseworker testified that Father did not implement any appropriate redirection or discipline with either of the children. Father walked out of a visit with his children because one of them was not listening to him, and after the next visit, Father said that he should have stayed home because he was not having a good day.

When the trial court ordered Father's visits to cease in May 2012, he did not take any formal steps to reinstate visitation rights. Father also missed multiple hearings regarding his children, even though he was properly notified about all of the hearings that occurred after he was served as a party to the suit. Father attended only one hearing on November 8, 2012 and the trial in April 2013.[15] Father did not attend any meetings at the CPS office regarding his children, including a CPS permanency conference in April 2012 at which CPS changed its goal for the children from reunification to termination.

Father also admitted to being treated for depression and anger issues and having attempted to commit suicide years before the trial. He was given medicine as part of his treatment, but he did not follow the prescriber's instructions, and he stopped taking the medicine. Furthermore, he admitted to two attempted overdoses in 1996 and 2000, but even so, he stopped seeing a doctor for his depression. Father admitted that the two counselors he saw through CPS recommended that he seek domestic violence and anger management counseling, and Father admitted that he had reported severe anger problems in 2012 but that he had not adhered to any of the professionals' recommendations. On an intake form during counseling, Father stated that he previously had thoughts of harming others and a history of damaging his own

---

[15]Father admitted to making many court appearances for criminal charges at the same courthouse as the proceedings related to this case by borrowing other people's cars. Even still, he maintained that he missed most of the proceedings concerning this case because of transportation problems.

property. At trial, Father admitted that he had thought of harming his current girlfriend as recently as April 2012, but he testified that he expressed this thought on his psychological forms as a means of "self-venting"; he stated that he would have actually harmed someone if he had "truly" desired to do so.

Father's employment history, although revealing that he has rarely recently been unemployed, indicates an inability to maintain a single job for a significant period of time. Father received worker's compensation and was unemployed from 2004 through June 2006. He then worked as a truck driver for Dr. Pepper from June 2006 until August 2006; he claimed that he quit so soon because his truck did not have air conditioning. From 2006 through 2008, Father worked for Key Energy; he claimed that he was terminated from Key Energy because he had filed a complaint against his supervisor. Father then worked as a delivery driver for J.B. Hunt in September 2010, but J.B. Hunt reduced his pay, and he stopped working there. Father then began working for a transportation company in November 2010 until approximately November 2011. Father claimed that he was unemployed when the CPS referral was filed in November 2011 because his driver's license had been suspended due to surcharges for not having insurance. During the period when his license was suspended, he worked at another company for near minimum wage from December 2011 until July 2012; he was eventually terminated for missing too much work and for excessive tardiness. Father regained his license in September 2012 and worked for Tuttle & Tuttle Trucking from October 2012 through January 2013. Following his job at Tuttle &

16

Tuttle, Father hauled sand for C.A.B. Logistics. He still held this job at the time of the trial in April 2013, but the job required him to be on the road for weeks at a time. He stated that he would attempt to find a "local job" should he regain custody of the children.

Father's housing history indicates similar instability. He testified that he lived with his sister in September 2010 before moving in with his current girlfriend at an apartment in October 2010, only a month after meeting her.[16] He and his girlfriend then moved into an apartment with his cousin in November 2010 before moving into a hotel room in December 2010. Father was confined in January 2011 for the first assault charge against his girlfriend, and he and his girlfriend separated at that time but reunited in February or March 2011. Father and his girlfriend continued to separate, live apart, and then reunite multiple times during 2011 and 2012. Father and his girlfriend moved into their current three-bedroom apartment at the end of 2012, and they continued to live in this apartment at the time of the trial.

**Father's girlfriend**

Father's girlfriend testified that she had a tumultuous and "rocky" relationship with Father at first but that the relationship had improved near the time of the trial. Although she testified that Father was never violent and had never struck her, she also identified altercations that had resulted in police

---

[16]Mother testified that she met Father in 2010 and moved in with him in January 2011.

17

reports and domestic violence charges. Furthermore, she claimed that she and Father were "actually fighting" in the second altercation in May 2011 when the police were called; she testified that "he was trying to kick [her] out [of] the door" and that "he slammed the door and it hit [her] in the face." Aside from these two incidents, she testified that she and Father had not had any more altercations resulting in the police being called.

When asked to speak about the children at trial, Father's girlfriend was able to give very little information. She did not know what grade either child was in, nor was she able to testify about the children's behavior. Furthermore, neither she nor Father had investigated possible schools the children would attend if they were returned to Father's custody; she also testified that neither she nor Father had looked for a counselor so that the children could continue therapy if they were returned. The children's foster mother had already ensured that the children were in a good school and that the school provided the children with individualized services tailored to their behavioral needs.

Father's girlfriend indicated that she would discipline the children if they returned by denying privileges rather than by using physical force as punishment. But she testified that she had previously argued with Father about disciplinary issues concerning two of his other children, and she also testified that she was not familiar with raising children that have the behavioral disorders that the children in this case have.

18

Father testified that his girlfriend was initially jealous of the children and that regaining custody of them was not a priority for her. The girlfriend did not begin to support Father's efforts to regain the children until the end of 2012. Father once tried to bring some toys to his children in December 2011, but his girlfriend complained that Father had stolen the toys from her own children. Furthermore, during the course of this case, Father repeatedly told his caseworker and counselor that he was not sure whether he would stay with his girlfriend, and these statements often coincided with the couple separating and reuniting. Father's girlfriend also admitted that she had not attended any of the counseling services that CPS had recommended for her. Lastly, Father repeatedly commented about his girlfriend's capricious temperament to the caseworker, identifying her as vindictive, jealous, and even "bipolar."

**Summary of procedural history**

Following Mother's domestic dispute with her partner in November 2011, the Department filed its original petition, asking to be named the children's temporary sole managing conservator. The Department sought termination of Mother's and Father's parental rights if reunification between them and the children could not be achieved. On the day that the Department filed its petition and later after an adversary hearing,[17] the trial court designated the Department as the children's temporary managing conservator.

---

[17]*See* Tex. Fam. Code Ann. § 262.201 (West Supp. 2012).

The Department filed a family service plan in January 2012, requiring Father to, among other tasks, complete a batterer's intervention program, refrain from engaging in criminal activity, maintain safe and appropriate housing, and attend court hearings related to the case. Father signed the family service plan, and the trial court later approved it, made it an order of the court, and advised the parents that progress under the plan would be reviewed at subsequent hearings. In another order, filed in April 2012, the trial court particularly required Father to participate in a batterer's intervention program. In May 2012, the trial court granted the Department's motion to prohibit further visits from Father with the children because, according to the Department, he had not fully engaged in services and had not routinely visited the children.

In October 2012, the trial court extended the statutorily-imposed date for dismissal of the suit[18] and set it for trial in April 2013. In permanency hearing orders filed in November 2012 and January 2013, the trial court found that Father had been participating in services but had not demonstrated adequate compliance with the service plan.

The parties tried the case before a jury in April 2013. After receiving evidence and arguments, the jury made findings that required the termination of Mother's and Father's parental rights. Concerning Father, the jury unanimously found by clear and convincing evidence that he had knowingly placed or

---

[18] *See* Tex. Fam. Code Ann. § 263.401(b) (West 2008).

20

knowingly allowed the children to remain in conditions or surroundings that had endangered their physical or emotional well-being, that he had engaged in conduct or knowingly placed the children with persons who engaged in conduct that had endangered their physical or emotional well-being, that he had failed to comply with the provisions of a court order that specifically established actions necessary for him to obtain the return of the children while they had been in the Department's conservatorship for not less than nine months as a result of removal for abuse or neglect, and that termination of Father's rights was in the children's best interest. In accordance with the jury's findings, the trial court signed an order terminating Mother's and Father's parental rights to the children. Father brought this appeal.[19]

**Evidentiary Sufficiency for the Termination of Father's Parental Rights**

In all of his issues, Father argues that the evidence is insufficient to prove the requirements for involuntary termination of his parental rights under section 161.001 of the family code. *See* Tex. Fam. Code Ann. § 161.001. In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b) (West 2008); *Holick v. Smith*, 685

---

[19]Mother has not appealed the trial court's judgment. She stopped participating in the proceedings below in October 2012 and did not attend the trial.

21

S.W.2d 18, 20 (Tex. 1985). Consequently, "[w]hen the State seeks to sever permanently the relationship between a parent and a child, it must first observe fundamentally fair procedures." *In re E.R.*, 385 S.W.3d 552, 554 (Tex. 2012) (citing *Santosky v. Kramer*, 455 U.S. 745, 747–48, 102 S. Ct. 1388, 1391–92 (1982)). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *Id.*; *Holick*, 685 S.W.2d at 20–21.

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. §§ 161.001, .206(a). Due process demands this heightened standard because "[a] parental rights termination proceeding encumbers a value 'far more precious than any property right.'" *E.R.*, 385 S.W.3d at 555 (quoting *Santosky*, 455 U.S. at 758–59, 102 S. Ct. at 1397); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2008).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subsection (1) of the statute and must also prove that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a

factfinder could reasonably form a firm belief or conviction that the challenged ground for termination was proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment. *Id.* We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *Id.*

We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the factfinder's province. *Id.* at 573–74. And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the verdict with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated a subsection under section 161.001(1) and that the termination of the parent-child relationship would be in the best interest of the child. Tex. Fam. Code Ann. § 161.001(1); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not

23

reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient.  *H.R.M.*, 209 S.W.3d at 108.

**The propriety of termination under section 161.001(1)(O)**

Subsection (O) of section 161.001(1) authorizes termination if a factfinder finds by clear and convincing evidence that a parent has

> failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child.

Tex. Fam. Code Ann. § 161.001(1)(O); *see In re E.C.R.*, 402 S.W.3d 239, 240 (Tex. 2013) ("The Family Code allows a court to terminate a parent's rights to her child if the child has been in the State's custody for at least nine months, and the State proves, by clear and convincing evidence, that the parent failed to comply with a court order that specified what she had to do to get her child back.").

In his second issue, Father contends that the evidence supporting termination under subsection (O) is legally and factually insufficient and that the trial court abused its discretion by submitting a question to the jury under subsection (O) because CPS removed the children from Mother in November 2011 and because there is therefore no evidence that the children were removed from Father as a result of abuse or neglect.  Specifically, Father argues that he had

24

not seen the children in the year prior to their removal and therefore could not have been *the [p]arent* from whom the children were removed and who had been in the temporary managing conservatorship of the Department for not less than nine months as a result of the children's removal from *the parent* under Chapter 262 for the abuse or neglect of the children.

Father does not challenge the legal or factual sufficiency of the evidence to show that he failed to comply with the provisions of an order that established the actions necessary for him to obtain the return of his children, nor does Father contest that the Department had maintained conservatorship over his children for at least nine months preceding the trial.[20]  Similarly, Father does not argue that the children were not properly removed under chapter 262 as the result of abuse or neglect; he simply asserts that they were not removed from him as a result of his abuse or neglect.  Thus, Father limits his argument under subsection (O) to whether the subsection may operate as a ground for the termination of his parental rights when he was not the specific parent from whom the children were physically removed and when he may not have subjected the children to the abuse or neglect that warranted their removal.

---

[20]The trial court named the Department as managing conservator of the children on November 14, 2011, and the Department remained managing conservator of the children continuously throughout the pendency of this case. Furthermore, even though Father does not contest the legal or factual sufficiency of the evidence to show that he failed to comply with the provisions of his court-ordered service plan, we note that the record establishes that he failed to attend batterer's intervention classes and to cooperate with the recommendations of his counselors as required by the trial court.

Contrary to Father's statement that the law is "silent" about whether a parent from whom a child is not physically removed may face termination under subsection (O), this court and many of our sister intermediate appellate courts have held that a parent from whom children are not physically removed must comply with court-ordered services and that subsection (O) may operate as a ground for termination for such a parent so long as the other requirements under subsection (O) are fulfilled. *See* Tex. Fam. Code Ann. § 161.001(1)(O); *In re D.R.J.*, 395 S.W.3d 316, 319–20 (Tex. App.—Fort Worth 2013, no pet.) ("[S]ubsection (O) does not require that the parent who failed to comply with a court order be the same person whose abuse or neglect of the child warranted the child's removal."); *In re D.R.A.*, 374 S.W.3d 528, 532 (Tex. App.—Houston [14th Dist.] 2012, no pet.) (holding that a father was required to comply with all of the requirements of the court-ordered service plan even though the child was neither removed from his home nor removed as the result of allegations of abuse or neglect made specifically against him); *see also In re M.D.*, No. 10-13-00005-CV, 2013 WL 1558012, at *2 (Tex. App.—Waco Apr. 11, 2013, pet. filed) (mem. op.) (holding that a father was required to comply with the court-ordered service plan or be subject to termination under subsection (O) even though the children were removed as a result of abuse or neglect by the mother); *In re A.M.C.*, No. 09-12-00314-CV, 2012 WL 6061031, at *6 (Tex. App.—Beaumont Dec. 6, 2012, no pet.) (mem. op.) ("[T]he children need not be removed from the parent who failed to comply with the court order. . . . [B]y taking the children into its

26

possession and by obtaining an order for substitute care of the children after a full adversary hearing, the Department effectively removed the children from both parents.").

Because Father falls within the purview of subsection (O) and because he does not contest the legal or factual sufficiency of the evidence supporting the other requirements of subsection (O)—whether CPS maintained conservatorship for at least nine months, whether he complied with the court-ordered service plan, or whether the children were removed due to abuse or neglect—we conclude that the evidence was not legally or factually insufficient to support the jury's finding that termination was supportable under subsection (O) and that the trial court did not abuse its discretion by submitting a question to the jury concerning that subsection. *See* Tex. Fam. Code Ann. § 161.001(1)(O); *D.R.J.*, 395 S.W.3d at 319–20; *In re S.N.*, 287 S.W.3d 183, 188 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (op. on reh'g). We overrule Father's second issue.

**The propriety of termination under section 161.001(1)(D)**

Furthermore, we hold that the evidence is legally and factually sufficient to show that Father knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered their physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(1)(D).[21] Under subsection (D),

---

[21]We will briefly address the sufficiency of the evidence to support termination under section 161.001(1)(D) because even though the trial court's finding under that subsection is not necessary to support the order of termination in this case in light of our holding above concerning section 161.001(1)(O), the

27

endanger means to expose to loss or injury or to jeopardize. *In re M.C.T.*, 250 S.W.3d 161, 168 (Tex. App.—Fort Worth 2008, no pet.). To sustain termination under subsection (D), "there must be proof that the parent was aware of the potential for danger to the child in such an environment and disregarded that risk." *In re C.D.E.*, 391 S.W.3d 287, 296 (Tex. App.—Fort Worth 2012, no pet.). Conduct of a parent in the home can create an environment that endangers the physical and emotional well-being of a child. *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.); *see In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.) (op. on reh'g) ("Inappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in his home is a part of the 'conditions or surroundings' of the child's home under section 161.001(1)(D)."). "To support a finding of endangerment, the parent's conduct does not necessarily have to be directed at the child nor is the child required to suffer injury." *M.C.T.*, 250 S.W.3d at 168–69; *see also In re J.R.*, 171 S.W.3d 558, 570 (Tex. App.— Houston [14th Dist.] 2005, no pet.) ("The unambiguous language of subsection

---

finding could be used to support the termination of Father's parental rights in a future case involving different children. *See* Tex. Fam. Code Ann. § 161.001(1)(M); *In re S.N.*, 272 S.W.3d 45, 60–61 (Tex. App.—Waco 2008, no pet.) (op. on reh'g); *In re T.N.S.*, 230 S.W.3d 434, 438 (Tex. App.—San Antonio 2007, no pet.); *see also In re K.A.F.*, No. 05-12-01582-CV, 2013 WL 3024864, at *9 (Tex. App.—Dallas June 14, 2013, no pet.) (mem. op.) ("Because an affirmative finding that Mother's rights should be terminated based on her placing the children in dangerous conditions or engaging in endangering conduct could be used to support termination of her parental rights with respect to any future child she may have, we continue our review.") (footnote omitted).

28

161.001(1)(D) requires proof of [a parent's] knowing *exposure of the children* to an endangering environment in the past.") (emphasis added).

On the day that Father called CPS in June 2010, he testified that he had reason to believe that Mother was intoxicated, that he knew she could be violent when intoxicated, and that he nevertheless decided not to contact law enforcement. Instead, he left the children in the apartment with her, called CPS, and left before CPS arrived. Father further testified that Mother was acting erratically and that he was afraid that a physical altercation would ensue if he personally attempted to take the children at that time. He admitted at trial that he had left his children in an "endangering situation" by allowing them to remain in the apartment with Mother, but he attempted to qualify this admission by stating that he had called CPS and had believed that he was protecting his children by doing so. Lastly, he stated that he did not take the children himself at that time because he was working long hours and would not have been able to care for them.

Father testified that he went to the children's apartment several times after June 2010 while attempting to check them. Throughout the course of CPS's first investigation, however, Father did not take action to pursue any type of protective custody for the children. And as the Department argues, Father failed to remedy the children's endangering conditions or surroundings in other ways, such as not contacting authorities although he knew that Mother smoked marijuana and drank alcohol while pregnant with the children because doing so was not "[his]

29

responsibility," returning the children to Mother in 2008 although he knew that she did not have stable housing at that time and that she had a history of engaging in domestic violence, and allowing the children to remain with Mother on a day in 2010 after he had found that they had been left at home alone for several hours and that their hygiene was "horrible."

Because we hold that the evidence is legally and factually sufficient to sustain the jury's finding that Father placed or allowed the children to remain in conditions or surroundings that endangered their physical or emotional well-being, we overrule that part of his first issue. *See* Tex. Fam. Code Ann. § 161.001(1)(D); *H.R.M.*, 209 S.W.3d at 108; *J.P.B.*, 180 S.W.3d at 573–74. We decline to address the remaining part of his first issue, which challenges whether the evidence is also sufficient to establish the propriety of termination under section 161.001(1)(E). *See* Tex. R. App. P. 47.1; *J.T.G.*, 121 S.W.3d at 128.

**The children's best interest**

In his third issue, Father argues that the evidence is factually insufficient to show that termination was in the children's best interest. There is a strong presumption that keeping a child with a parent is in the child's best interest. *M.R.J.M.*, 280 S.W.3d at 506 (citing *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006)). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (West 2008).

When determining whether involuntary termination is in the best interest of a child, a factfinder may consider the desires of the child, the emotional and physical needs of the child now and in the future, the emotional and physical danger to the child now and in the future, the parental abilities of the individuals seeking custody, the programs available to assist these individuals to promote the best interest of the child, the plans for the child by these individuals or by the agency seeking custody, the stability of the home or proposed placement, the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one, and any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). The factors in *Holley* are not exhaustive, and a petitioner need not prove each factor as a condition precedent to parental termination. *C.H.*, 89 S.W.3d at 27 ("The absence of evidence about some of these considerations would not preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest . . . ."). On the other hand, paltry evidence relevant to each factor does not adequately support a jury's finding that termination is in the best interest of the children. *Id.* Furthermore, although proof of an act or omission required under section 161.001(1) does not relieve the burden of establishing best interest under section 161.001(2), the same evidence may be probative of both issues. *Id.* at 28.

The children have not expressly indicated their desire to live with Father. Furthermore, many witnesses at trial noted that the children often expressed

31

sorrow over missing Mother but rarely mentioned Father or grieved their separation from him. When the counselor asked the children whether they wished to live with Father, they indicated that they were willing to return to him but primarily emphasized their desire to remain together.[22] Also, when the older child was asked how he felt about his current foster placement, he responded, "Good, I like it here."

Both children have unique emotional needs because of the behavioral issues they have developed. Specifically, they require a great deal of individual attention, patience, and structure—even more so than the average child. For instance, the older brother has had severe disciplinary problems at school, often being sent home because of his misbehavior. At school, he often tries to run away, throw items, or kick and bite teachers. Furthermore, the older child exhibits manipulative behavior. For example, if the foster mother does not give the child the particular toy he wants, he will "accidentally" break the toy he is given so that he might play with the toy that he originally desired. Also, the older child has learned that he will be sent home if he acts out in school, and he often does so intentionally to spend one-on-one time with his foster mother. At home, the older child is prone to tantrums when he does not get his way; he is

---

[22]The children had been sent to separate placements because of the older child's behavioral issues. They lived apart for four or five months but were reunited in January 2013 when the younger brother joined the older brother at a foster home.

impulsive, rash, and aggressive; and he often acts defiantly, attempts to make himself hyperventilate, or threatens to harm himself when told "no."

The younger brother also has unique emotional needs. The older brother often nurtured and protected the younger brother, and the younger brother developed an extreme attachment to the older brother such that he has trouble sharing the attention of his older brother. He hit his older brother or acted out in order to gain his older brother's attention. The younger brother also had a distinct "honeymoon period" with his current foster mother, meaning that he behaved exceedingly well for a few weeks before lapsing back into his disciplinary issues. The foster mother had approached these disciplinary issues well, though, such that at the time of the trial, they were beginning to subside.

The children's foster mother at the time of trial, a licensed social worker, is skilled in meeting the individual needs of both children. In addition to providing a caring and stable environment, the current foster mother had taken specific action to remedy the disciplinary issues of the children. Most notably, the foster mother had worked extensively with the older brother's school to establish a behavioral inhibitions intervention plan, which would allow the older child to receive individual behavioral services at school rather than being sent home when he misbehaves.

On the other hand, Father's girlfriend admitted that she had no experience meeting the needs of children with the behavioral and emotional needs of the children in this case. Although the girlfriend emphasized that she would employ

33

appropriate discipline by granting or denying privileges, she did not enumerate any other specific actions that she would take to meet the needs of the children. Whereas the foster mother had worked to establish individualized programs for the children at their current school, neither Father nor his girlfriend had searched for or visited potential schools for the children. Also, although the children were making great progress with their counselor and foster mother, Father and his girlfriend had not sought out potential counselors for the children. Throughout the course of conversations that a CPS caseworker had with Father from late 2011 until April 2012, Father described his girlfriend as bipolar, moody, jealous, and "haywire."

The children's counselor testified that the children needed "[s]tability, consistency, patience," and an "example . . . to follow." The counselor also testified that the children would tend to follow the actions of their authority figures. Thus, the jury could have reasonably found that it was not in the children's best interest to live with adults who had a history of domestic violence, housing instability, and sporadic employment. The counselor further stated,

> They're very sweet children. But if you are not trained, if you're not patient enough to know that they . . . have some emotional scars, so to speak, and they can act out, you may not be able to deal with it.
>
> They can be trying, manipulative, and even sneaky at times. . . . [T]hey can really put a test or strain on the parent, if you don't know how to handle it.

The evidence does not show that Father is equipped to meet these needs adequately.[23] Specifically, the evidence establishes that Father has a history of domestic violence, as evidenced by his own admission and charges for assault against his current girlfriend. At trial, the children's counselor was "very concerned" that Father had not completed batterer's intervention services but was nonetheless requesting for his children to be returned to him. Furthermore, the counselor testified that sending the children back to Father, whose relationship with his girlfriend was tumultuous and unstable, could be detrimental to the children's progress or even cause regression. Also, even though the counselor testified that it was important for a parent to demonstrate healthy coping behavior to the children, Father had demonstrated the exact opposite when he got upset and walked out of a visitation with his children because they were not behaving or following his instructions. Lastly, whereas the foster mother and the children had a trusting, loving, structured, and caring relationship, Father often acted distant at visitations by spending most of the visit sitting in a chair and talking to the children without physically interacting with them.

---

[23]Furthermore, there is evidence that Father and his girlfriend were unable to discipline one of his older children properly when that child lived with them in the past. This child was in high school and had problems with burglary and marijuana. Father allowed the child to return to his mother even though the mother would not discipline the son. He admitted that allowing his son to return to live with his mother was not in the child's best interest but testified that he let his son return because he could not deal with the son's "mischievousness." Father testified that his girlfriend had no significant relationship with the child, so she did not attempt to discipline him either.

Although there is no evidence that the children were physically or sexually abused by Father, some evidence exists that Father may have sexually abused Mother in the past,[24] and there is a great deal of evidence indicating that Father poses a risk or threat of physical abuse in the children's home and that he has not taken any steps to alleviate this risk factor. CPS included a batterer's intervention program in Father's service plan, and the trial court ordered this as a service necessary for the return of his children. Father did not participate in this service, however, in the near-year between the court ordering the service in April 2012 and the trial in April 2013.[25] Also, as stated above, the children's counselor testified that the instability of Father's relationships, his history of domestic violence, and his noncompliance with court-ordered services were all causes of concern. She believed that placing the children with Father under these conditions could lead to further emotional and behavioral detriment and even undermine the progress that the children had made in their current placement.

In general, Father disregarded the professional opinion of his counselors as to what programs he ought to complete and substituted his own opinion as to what programs were relevant to his life. This suggests both that he has a problem recognizing how and why his behavior may hinder him from promoting

---

[24]CPS did not, however, require Father to complete any services related to Mother's allegation of sexual abuse.

[25]Despite his own admission of domestic violence in the past, Father testified that he simply did not need to take a batterer's intervention or domestic violence class because "there wasn't any domestic violence in the first place."

36

his children's best interest and that he is generally unwilling to participate in services that professionals suggest may help him promote his children's best interest unless he decides that the programs would help him do so.

Furthermore, although the trial court never ordered services for Father's girlfriend, both CPS and CASA indicated that they wished for the girlfriend to complete services, such as individual and couple's counseling, because the children would live with her as well if they were returned to Father. Multiple witnesses testified at trial that the girlfriend was jealous of Father's relationship with the children and was initially unsupportive of his efforts to regain custody of his children. Completion of the services, although recommended and not required, could have helped to mitigate concerns that the girlfriend would not be able to promote the best interest of the children because of her jealousy, but she chose not to participate in the services.

Father and his girlfriend indicated at trial that they had plans they would pursue if Father regained custody of the children, and many of these proposed plans were positive. For example, the couple had just moved into a three-bedroom apartment, and they testified that they intended to furnish the apartment appropriately should the children be returned. They also stated that they would take the children to church and encourage them to pursue extracurricular activities such as athletics. Also, even though Father's job required him to be gone for weeks at a time, he said that he would seek out a local job that did not require long-term absences should the children be returned. On the other hand,

37

as stated above, Father and his girlfriend had not made any significant plans regarding the children's education, individual behavioral needs at school, or the children's counseling needs, even though they admitted that these services would be vital to raising the two children.

Father missed numerous visits with his children, nearly all of the court hearings regarding his children, and every meeting at the CPS office regarding his children. His excuse for his absence at these visits, hearings, and meetings was that he could not find transportation; however, Mother attended most of these events while having similar difficulties securing transportation.

Deborah Mancino, the CASA advocate assigned to the children's case, testified that when she first met the children in December 2011, they were "broken." Mancino testified, however, that the children's foster mother had built trust with the children, had provided structure and affection, and had placed the children into Bible study groups. Mancino expressed concern that Father had not completed a batterer's intervention class or followed recommendations from professionals in the CPS case. According to Mancino, the children had talked about missing Mother but had not spoken about Father near the time of the trial. Also, Mancino testified that during the children's visits with Father, "there wasn't [a] paternal bond that you think would be there."

In sum, considering the relevant factors, we hold that the evidence that was presented at trial and that is summarized above was factually sufficient for the jury to reasonably establish a firm belief or conviction that termination of

38

Father's parental rights was in the children's best interest. *See* Tex. Fam. Code Ann. § 106.001(2); *Holley*, 544 S.W.2d at 371–72; *S.B.*, 207 S.W.3d 877, 887–88 (Tex. App.—Fort Worth 2006, no pet.) ("A parent's drug use, inability to provide a stable home, and failure to comply with his family service plan support a finding that termination is in the best interest of the child."); *In re A.C.B.*, 198 S.W.3d 294, 297–98 (Tex. App.—Amarillo 2006, no pet.) (holding that substantial compliance with a service plan does not preclude a finding that termination was in the children's best interest); *see also In re S.G.*, No. 02-11-00122-CV, 2011 WL 5527737, at *8 (Tex. App.—Fort Worth Nov. 10, 2011, no pet.) (mem. op.) (sustaining a finding that termination was in a child's best interest when the father failed to complete services and address his "anger issues and domestic violence" or "alleviate the risk of abuse or neglect to the children"); *In re Z.C.*, 280 S.W.3d 470, 476 (Tex. App.—Fort Worth 2009, pet. denied) (noting that "[s]tability and permanence are paramount in the upbringing of a child" and affirming a finding that termination was in a child's best interest when the child showed improvement in foster care). Although there are both positive and negative considerations in this case that could have influenced the jury's best interest finding, we give deference to the jury's finding and do not supplant the verdict with our own. *See H.R.M.*, 209 S.W.3d at 108. Accordingly, we overrule Father's third issue.

## Conclusion

Having overruled all of Father's issues, we affirm the trial court's judgment terminating his parental rights to A.D.C. and J.D.C.

                                              TERRIE LIVINGSTON
                                              CHIEF JUSTICE

PANEL:  LIVINGSTON, C.J.; WALKER and MCCOY, JJ.

DELIVERED:  October 3, 2013